This memorandum opinion was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO,**

     Plaintiff-Appellee,

v.                                       **NO. 28,296**

**DIANNA SPRAYBERRY,**

     Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF OTERO COUNTY**
**James Waylon Counts, District Judge**

Gary K. King, Attorney General
Ann M. Harvey, Assistant Attorney General
Santa Fe, NM

for Appellee

Hugh W. Dangler, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**VANZI, Judge.**

Defendant appeals her conviction for arson following a jury trial. She raises claims of insufficient evidence, prosecutorial misconduct, and whether the district court erred in failing to grant her request for a new trial based on insufficient evidence and prosecutorial misconduct. For the reasons that follow, we affirm.

**BACKGROUND**

Defendant was charged with one count of arson (over $1000), contrary to NMSA 1978, Section 30-17-5(A)(3) (1970) (amended 2006). The charge stemmed from a fire that Defendant allegedly started when she threw a smoke bomb into a 2001 Ford Focus. On the evening of June 30, 2006, Defendant had been involved in a dispute with the car's driver, Breeanna Woodward, and her friends. When Officer David K. Garrett first spoke to Defendant at her home, she admitted that she had gone to Woodward's house and wrote "nasty bitch" on the windshield with car chalk. Defendant later admitted during a recorded interview at the police station that she threw a smoke bomb into the vehicle. She was subsequently charged with arson. We discuss additional facts as they relate to the individual claims raised by Defendant in this appeal.

**DISCUSSION**

**I.     There Was Sufficient Evidence to Convict Defendant of Arson**

**Standard of Review**

"In reviewing the sufficiency of the evidence, we must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. This review "requires analysis of whether direct or circumstantial substantial evidence exists and supports a verdict of guilt beyond a reasonable doubt with respect to every element essential for conviction. We determine whether a rational fact[]finder could have found that each element of the crime was established beyond a reasonable doubt." *State v. Kent*, 2006-NMCA-134, ¶ 10, 140 N.M. 606, 145 P.3d 86 (citations omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Salgado*, 1999-NMSC-008, ¶ 25, 126 N.M. 691, 974 P.2d 661 (internal quotation marks and citation omitted). We do "not weigh the evidence or substitute [our] judgment for that of the fact finder as long as there is sufficient evidence to support the verdict." *State v. Mora*, 1997-NMSC-060, ¶ 27, 124 N.M. 346, 950 P.2d 789, *abrogated on other grounds by Kersey v. Hatch*, 2010-NMSC-020, 148 N.M. 381, 237 P.3d 683. Finally, we note that "[j]ury instructions become the law of the case against which the sufficiency of the evidence is to be measured." *State v. Smith*, 104 N.M. 729, 730, 726 P.2d 883, 884 (Ct. App. 1986).

**The State Presented Substantial Evidence From Which the Jury Could Find That Defendant Caused the Fire and to Support Her Conviction Without Reliance on Her Subsequently Recanted Confession**

Defendant was charged with and convicted of arson (over $1000) pursuant to Section 30-17-5(A). In order for the jury to find Defendant guilty of arson, the jury was required to find beyond a reasonable doubt that

1. [D]efendant started a fire or caused an explosion;
2. She did so with the intent to destroy or damage a 2001 Ford Focus, which belonged to another and which had a market value of over $1,000;
3. This happened in New Mexico on or about the 30th day of June, 2006.

*See* UJI 14-1701 NMRA. The jury was further instructed that the "market value" of the car is the "price at which the property could ordinarily be bought or sold just prior to the time of its destruction or damage." UJI 14-1707 NMRA.

Defendant argues that the State failed to prove the first element of arson because the only evidence of the cause of the fire was the lay opinion of Officer Garrett. Defendant further contends that the State failed to prove she started the fire because it relied only on her subsequently recanted confession and not on any "independent evidence linking her to the crime."

We begin with Defendant's argument that there was insufficient evidence to support the conviction. In support of this contention, Defendant notes that the State

failed to prove that the fire was definitively caused by the smoke bomb. Further, Defendant contends that there was no proof that Defendant placed the smoke bomb in the car or that she caused the fire in the car. Thus, Defendant argues that there was insufficient evidence to prove the first element of the arson instruction. We disagree.

In this case, a 2001 Ford Focus owned by Kenneth Shaffer was found on fire in the street outside Shaffer's house in the early morning hours of June 30, 2006. Shaffer's daughter, Breeanna Woodward, usually drove the vehicle. The jury heard testimony from several witnesses, including Defendant, of driving incidents that had occurred earlier in the day. Woodward testified that she was driving with her cousin, a friend, and her son when she crossed paths with Defendant in another vehicle. The vehicles were cutting each other off and switching lanes. Monica Cuellar, who was with Woodward, also testified about the encounter and told the jury that the conflict was based on a falling out over a young man. Maricela Vitela was driving the car that Defendant was in, and she testified that Woodward had been following them everywhere they went that day. Defendant herself told the jury about the angry words and hand gestures that were exchanged.

At about 1:30 or 2:00 on the morning of June 30, 2006, Shaffer was asleep and was awakened by his daughter who told him that the car was on fire. When he went outside, Shaffer saw a friend of his daughter's trying to put the fire out with a garden

hose.  Shaffer, who is a volunteer firefighter with Alamo West Fire and Rescue, grabbed a fire extinguisher from the back of his truck and put out the fire.  He then waited for the police and fire department to arrive.  Shaffer testified that he saw the back seat of the car "all burned up," and he saw a firecracker-type object with a pedestal on it lying on its side in the back seat.  Shaffer also testified that the words, "dirty bitch" had been written on the front windshield.

Alamogordo police officer, David Garrett, who responded to the scene of the fire, testified that the damage to the vehicle was in the back seat of the car and that the cushions in the back seat were completely gone.  He found a medium-sized tube that looked like a firecracker and a lighter in that area.  Thereafter, and based on information that he received from Woodward, Officer Garrett contacted Defendant at her home.  Defendant told the officer that she wrote "dirty bitch" on the windshield, at which point he stopped the interview and asked Defendant if she would accompany him to the police station for a more thorough interview.

After being read her *Miranda* rights, Defendant told Officer Garrett that she had been at her boyfriend's house earlier in the day when she saw Woodward drive by. She and her friend, Vitela, got into a car and followed Woodward.  As we have described above, the occupants of the two cars yelled and followed one another. Defendant told the officer that she later went back to her house and got car chalk and

6

a smoke bomb. She and Vitela then drove to Woodward's house. Defendant got out of the car, walked over to the Ford Focus, wrote "dirty bitch" on the windshield, lit the smoke bomb, and threw it in the car.

In addition to Officer Garrett's testimony, Vitela testified that she drove Defendant to Woodward's house at around midnight on June 30. She expected that there might be a fight because the two women did not get along. Vitela, who had parked a few houses down from Woodward's house, told the jury that she had fireworks in her car that she and Defendant had purchased earlier in the day, as well as some window chalk. Defendant got out of the car, went to the front of the house, and about fifteen seconds later, ran back to the car. Although she did not see Defendant light a smoke bomb, Vitela saw smoke coming from the car as they were driving away. She thought the smoke was coming from a smoke bomb lit next to the car. The smoke bomb—"a long thing"—looked like the smoke bombs that she and Defendant had purchased.

The jury also heard testimony from Cuellar that the Defendant and Woodward were involved in a conflict over a young man. Cuellar further testified that, sometime after the fire, she heard Defendant on a speaker phone say "whatever happened to [Woodward's] car she deserved what she got."

7

Rachel Casias testified that, sometime after the fire, she ran into Defendant and Vitela at the local Walmart. During the course of their conversation, Defendant and Vitela told Casias that they threw a smoke bomb into the car. They were laughing about it as if it was a joke, saying the car caught on fire.

Contrary to Defendant's assertion, given the above facts, we conclude that sufficient evidence was presented that the fire was started as a result of a smoke bomb being thrown through the window of the vehicle. Officer Garrett explained the damage to the vehicle and that he found a firecracker and lighter in the burned area on the back seat. Shaffer and Woodward also testified about the presence of a firework "tube" in the back seat of the car. There was substantial testimony, including from Defendant herself, that placed her at the scene just prior to the fire. In addition, Defendant and Vitela both testified that they had purchased fireworks—including smoke bombs—earlier in the day and that those fireworks were in the car when they drove to Woodward's house. Although Vitela did not actually see Defendant throw a smoke bomb into the car, she testified that she saw smoke from the smoke bomb after Defendant was at the vehicle and that Defendant ran back to the car. Finally, both Officer Garrett and Casias testified that Defendant admitted throwing the smoke bomb into the car. Viewing the evidence in the light most favorable to the State, a reasonable jury could conclude that Defendant threw the smoke bomb into

Woodward's car and that the smoke bomb caused the fire damage to the vehicle. We hold that there was sufficient evidence to support Defendant's conviction for arson.

We further reject Defendant's argument that there was insufficient evidence to support her conviction because the State only relied on the subsequently recanted confession to prove her crime. Defendant relies on *State v. Weisser*, 2007-NMCA-015, ¶ 10, 141 N.M. 93, 150 P.3d 1043, for the proposition that the corpus delicti rule is to prevent the conviction of a defendant who confesses to a non-existent crime as a result of coercion or, in this case, a recanted confession. As we have discussed above, however, there was sufficient evidence presented at trial from other witnesses as to the cause of the fire and as to Defendant's proximity to the vehicle when the smoke bomb was lit. Because we have already concluded that the jury was entitled to infer that a smoke bomb thrown by Defendant started the fire, her argument of insufficient evidence necessarily fails.

**The State Presented Substantial Evidence That the Market Value of the Car Exceeded $1000**

Defendant argues, pursuant to *State v. Franklin*, 78 N.M. 127, 428 P.2d 982 (1967), and *State v. Boyer*, 103 N.M. 655, 712 P.2d 1 (Ct. App. 1985), that the evidence presented at trial was insufficient to establish the value of the damaged car. We disagree.

In *State v. Hughes*, 108 N.M. 143, 145-46, 767 P.2d 382, 384-85 (Ct. App. 1988), we noted that "[i]t is clear that an owner of personal property may testify concerning the value of the property and that such testimony is sufficient to support a jury's determination of value." We explained that "[t]he reason for this rule is that the owner necessarily knows something about the quality, cost, and condition of his or her property and consequently knows approximately what it is worth." *Id.* at 146, 767 P.2d at 385. In *Hughes*, the defendant was charged with receiving stolen property over $100. *Id.* at 145, 767 P.2d at 384. Based on this rule, we held that a property owner's testimony that his property had a value well over $100, based on the owner's knowledge of the replacement cost of the property, was sufficient to support the valuation element of larceny because "[t]he jury could reasonably infer . . . that the price at which the property could ordinarily have been bought or sold was in excess of $100 at the time it became received stolen property." *Id.* at 146, 767 P.2d at 385. In so holding, we also explained that "market value means the price at which the property could ordinarily be bought or sold." *Id.* (internal quotation marks omitted).

Here, the jury heard testimony from both Shaffer and Woodward that the vehicle was five or six years old at the time of the incident and was in good condition prior to the fire. Further, there was ample testimony that the damage to the back seat was severe and that the back seat cushions were virtually destroyed. Shaffer testified

that a body shop estimated the cost of the repair to be $5000. An estimate appears in the record that supports this assertion. We therefore conclude that the testimony presented was sufficient to establish that the value of repairing the car was at least $1000.

**II.     There Was No Prosecutorial Misconduct in This Case**

**Standard of Review**

"The trial court has broad discretion in controlling the conduct and remedying the errors of counsel during trial." *State v. Duffy*, 1998-NMSC-014, ¶ 46, 126 N.M. 132, 967 P.2d 807. When an issue of prosecutorial misconduct has been preserved by a specific and timely objection at trial, "we determine whether the trial court abused its discretion by denying a motion for a new trial based upon the prosecutor's conduct, by overruling the defendant's objection to the challenged conduct, or by otherwise failing to control the conduct of counsel during trial." *Id.* (noting that "the trial court is in the best position to evaluate the significance of any alleged prosecutorial errors"). If no claim of prosecutorial misconduct was raised at trial, we review for fundamental error. *State v. Allen*, 2000-NMSC-002, ¶ 95, 128 N.M. 482, 994 P.2d 728. "Prosecutorial misconduct rises to the level of fundamental error when it is so egregious and had such a persuasive and prejudicial effect on the jury's verdict that the defendant was deprived of a fair trial." *Id.* (internal quotation marks and citation

omitted). "An isolated, minor impropriety ordinarily is not sufficient to warrant reversal, because a fair trial is not necessarily a perfect one[.]" *Id.* (internal quotation marks and citation omitted).

**There Was No Prosecutorial Misconduct as a Result of Brad Ledbetter's Testimony, Nor Was There Fundamental Error**

In this case, Defendant argues that she must be granted a new trial based on two instances of prosecutorial misconduct. Defendant first contends that the prosecutor committed prosecutorial misconduct when he instructed witness Brad Ledbetter to testify that Defendant has a reputation for untruthfulness. In this regard, Defendant makes no argument except to state that such misconduct occurred when the prosecutor instructed Ledbetter on how to testify. We note that Defendant does not claim that defense counsel requested a mistrial based on this instance of alleged prosecutorial misconduct. For the reasons that follow, our review of the record does not indicate that the district attorney forced the witness to testify in a false manner.

After the defense had rested, the State called Ledbetter as a rebuttal witness. Ledbetter testified that he had known Defendant for about three years. When asked about Defendant's reputation for truthfulness, Ledbetter said that he did not have enough information. The prosecutor then asked Ledbetter if he remembered talking to him the day before and telling him that Defendant was a liar. Ledbetter answered, "Yeah."

12

On cross-examination, Ledbetter said that the prosecutor told him to say that Defendant was untruthful and that she lies. Ledbetter further elaborated, saying "I don't believe that their [sic] liars, I mean I wouldn't [trust] them with my word. I wouldn't trust nobody with my word unless they were my relatives. So he pretty much told me to come in and say that they were untruthful." On redirect, Ledbetter acknowledged that he was angry with the prosecutor because he had been subpoenaed and had to miss work.

After Ledbetter's testimony, the State called Bernadette Reynolds, a victim witness coordinator with the district attorney's office, for the limited purpose of showing Ledbetter's prior inconsistent statements. Reynolds explained to the jury that she had initially arranged for the interview with Ledbetter and that she was present during the interview which lasted less than five minutes. She told the jury that the prosecutor asked Ledbetter open-ended questions and went over what he was going to ask Ledbetter in court. Finally, Reynolds testified that Ledbetter was very impatient and hostile and that she did not believe that the prosecutor suggested that Ledbetter testify in any particular manner. The defense did not cross-examine Reynolds nor did she object on the grounds of prosecutorial misconduct.

As we have noted, because no claim of prosecutorial misconduct was raised at trial, we review only for fundamental error. In this case, we cannot say—and

Defendant does not argue—that there has been any miscarriage of justice or that Defendant's guilt is so doubtful it would shock the conscience to permit the conviction to stand, or that substantial justice has not been done. *See State v. Jim*, 107 N.M. 779, 780, 765 P.2d 195, 196 (Ct. App. 1988) ("It is [the] defendant's burden to bring up a record sufficient for review of the issues he raises on appeal."). We reject Defendant's claim that the district attorney committed prosecutorial misconduct by forcing Ledbetter to testify in a false manner.

**The Prosecutor's Failure to Produce the DVD of Defendant's Confession Was Not Prosecutorial Misconduct, Nor Was It Fundamental Error**

Defendant also argues that the district attorney committed prosecutorial misconduct by first giving notice to Defendant prior to trial that a video of her statement at the police station was damaged and could not be admitted, but then later trying to admit a repaired version of the DVD after Defendant testified. Defendant further contends that, although the video of her confession was not admitted into evidence, she was put at "a clear disadvantage" when the State did not produce the DVD in advance of trial. The "clear disadvantage" that Defendant appears to be claiming is that, had the prosecutor timely produced the DVD, she could have retained an expert to determine if the confession was coerced.

To the extent that Defendant argues on appeal that the district attorney committed prosecutorial misconduct by not disclosing the DVD prior to trial, we are

not persuaded. On rebuttal, the prosecutor stated that he was going to present the video of Defendant's interview with Officer Garrett at the police station in which she confessed and provided details about the arson. Defense counsel objected and argued that the video had been requested during discovery, but that the State told her the DVD had been damaged beyond repair and could not be viewed.

The district court allowed the defense to view the DVD before contesting its admission. After viewing the DVD, defense counsel renewed her objection to the DVD, and the district court sustained the objection. Given that the district court provided the remedy Defendant requested at trial by suppressing the DVD, we cannot say that the State's failure to disclose it amounted to prosecutorial misconduct.

We are also not persuaded by defense counsel's argument to the district court that she would have hired an expert to review the DVD and determine whether or not the confession was coerced. Defendant relies on *Brady v. Maryland*, 373 U.S. 83 (1963), to support her argument that she was put at a disadvantage by not having the DVD in advance of trial. In *Brady*, the United States Supreme Court held that a defendant's due process rights are violated when the prosecution suppresses evidence favorable to the defense. 373 U.S. at 86. The Court noted three requirements necessary to prove a *Brady* violation: the evidence must have been suppressed by the prosecution, the evidence must have been favorable to the defendant, and the evidence

15

must have been material to the defense. *State v. Trujillo*, 2002-NMSC-055, ¶ 50, 131 N.M. 709, 42 P.3d 814.

We note at the outset that Defendant has not applied any of the *Brady* factors to the facts of this case. She merely argues that defense counsel informed the district court that the confession appeared to be coerced, that her trial strategy would have been different if she had the DVD, and that the prosecutor committed prosecutorial misconduct. Defendant provides no argument that the DVD was suppressed, how it would have been favorable to Defendant, or how it would have been material to the defense.

Moreover, to the contrary, the record does not support Defendant's argument. Under the first *Brady* element, there is no evidence that the DVD was suppressed. The prosecutor told the district court that he understood the non-working DVD had been given to the defense several months before the trial date. The district court did not find that the evidence was suppressed and instead took "the evidence custodian and his word" that, at some point in time, the DVD was not accessible to view.

As to the second and third *Brady* elements, we find nothing in the record or Defendant's brief that the video confession would be favorable to Defendant, or material to her defense. Although defense counsel argued to the district court that there were "signs to the fact that it was, in fact, a coerced confession," she never

suggested to the court that it was Officer Garrett who had coerced the confession. Instead, Defendant's own testimony was that she confessed to the arson based on threats from only Justin Ledbetter and Vitela. Defendant testified that Justin Ledbetter told her that "if she said she did not do it, then her kids and her mother would pay." And, over a sustained objection, Defendant testified that Vitela said that Defendant would pay if she blamed Vitela for the arson. Justin Ledbetter was never called to testify at trial, and Vitela was never cross-examined about the alleged threats. Our review of the DVD also confirms that the confession was voluntary and not coerced by Officer Garrett, and that Defendant never told Officer Garrett that she was confessing because she had been threatened by Justin Ledbetter and Vitela.

Finally, we note again that Defendant did not raise a claim of prosecutorial misconduct at trial and, consequently, we review this allegation only for fundamental error. Under this standard, we are not persuaded that the conduct at issue rises to a level of fundamental error. *See Duffy*, 1998-NMSC-014, ¶¶ 46-47 (explaining that prosecutorial misconduct rises to the level of fundamental error when it is "so egregious" and "had such a persuasive and prejudicial effect on the jury's verdict that the defendant was deprived of a fair trial"). As we have discussed above, Defendant did not challenge the confession as coerced or involuntary based on Officer Garrett's conduct. Instead, Defendant claims that her confession was false because she had

17

been threatened by third parties who either did not testify at trial or who were not cross-examined about the alleged threats. As we have observed, there was sufficient evidence to convict Defendant of arson even without Officer Garrett's testimony about Defendant's confession. Nothing in the DVD deprived Defendant of a fair trial, nor can we say that its production would have changed the jury's verdict. Defendant's request for a new trial based on prosecutorial misconduct is denied.

**III.    The District Court Did Not Err In Denying Defendant's Motion for a New Trial**

"[M]otions for a new trial are not favored and will only be granted upon a showing of a clear abuse by the trial court." *State v. Stephens*, 99 N.M. 32, 35, 653 P.2d 863, 866 (1982).

Defendant argues that the district court erred in denying her motion for a new trial based on her claims of insufficient evidence and prosecutorial misconduct. As we have discussed, there was sufficient evidence at trial to convict Defendant of arson. We further determined that there was no prosecutorial misconduct in this case. Therefore, the district court did not abuse its discretion in refusing to grant Defendant's motion for a new trial.

**CONCLUSION**

For the reasons set forth above, we affirm the district court and Defendant's conviction.

18

**IT IS SO ORDERED.**

_____
**LINDA M. VANZI, Judge**

**WE CONCUR:**

_____
**MICHAEL D. BUSTAMANTE, Judge**

_____
**TIMOTHY L. GARCIA, Judge**